THE UNITED STATES of America, Plaintiff,

v.

CHARLESTON COUNTY, South Carolina; Charleston County Council; John O. Conlon, TOI Ahrens Estes, Cindy M. Floyd, Curtis E. Bostic, A.D. Jordan, Barrett S. Lawrimore, Timothy E. Scott, Leon E. Stavrinakis, Charles Wallace, members of Charleston County Council; Charleston County Election Commission, Defendants.

Lee H. Moultrie, George Freeman, Maggie McGill, and Sandra Flower, Plaintiffs,

v.

Charleston County Council, and Charleston County Election Commission, Defendants.

Nos. 2:01–0155–11, 2:01–562–11.

United States District Court, D. South Carolina, Charleston Division.

July 10, 2002.

Jon Rene Josey, Turner Padget Graham and Laney, Florence, SC, John H. Douglas, U.S. Attorneys Office, Charleston, SC, Joseph D. Rich, Christopher Coates, U.S. Department of Justice, Washington, DC, for Plaintiffs.

A. Arthur Rosenblum, Rosenblum and Goldberg, Charleston, SC, Bernard Eugene Ferrara, Jr., Joseph Dawson, III, Charleston County Legal Department, N Charleston, SC, Samuel W. Howell, IV, Howell and Linkous, Mt Pleasant, SC, Benjamin E. Griffith, Cleveland, MS, Lucas C. Padgett, Jr., Michael C. Scarafile, McNair Law Firm, Mikell Ross Scarborough, Charleston, SC, for Defendants.

## ORDER

DUFFY, District Judge.

This matter is before the Court upon the Magistrate Judge's recommendation that this Court grant Plaintiffs' motion for partial summary judgment on the three preconditions, as outlined in the United States Supreme Court decision, *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), requisite to a Voting Rights Act claim pursuant to 42 U.S.C. § 1973. A party may object, in writing, to a magistrate judge's Report and Recommendation ("Report") within ten days after being served with a copy of that report. 28 U.S.C. § 636(b)(1). The Magistrate's Report was filed on April 26, 2002. Defendants filed timely objections on May 6, 2002.

## DISCUSSION

### I. Magistrate Judge's Report and Recommendation

▇▇▇ The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the Court. *Mathews v. Weber,* 423 U.S. 261, 269, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The Court reviews *de novo* those portions of the Report to which a specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1)(C).

After a review of the entire record and the Report, and a *de novo* review of Defendants' objections, the Court finds that the Magistrate Judge fairly and accurately summarized the facts and applied the cor-

rect principles of law. Accordingly, the Magistrate Judge's Report is adopted in whole and incorporated into this Order by specific reference.

The Report sets forth in detail the relevant facts involved in this case, and the Court incorporates those facts as described in the Report without a recitation.

## II. Legal Standard For Summary Judgment

To grant a motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The Court is not to weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## III. Section 2 Violation

■ Plaintiffs have brought this action complaining that the present at-large system for electing members to the Charleston County Council was adopted with "an intent to discriminate against black voters and that it results in discrimination in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the Fourteenth Amendment of the Constitution of the United States." (Pl.s' Mem. Supp. Partial Summ. J. at 1). To prevail upon their claim for a violation of Section 2[1] of the Voting Rights Act, Plaintiffs must first establish the following preconditions, as outlined by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986):

1. that the minority group at issue is sufficiently large and geographically compact to constitute a majority in a single-member district;

---

1. Section 2(a) of the Voting Rights Act of 1965 prohibits a State or its political subdivisions from imposing any voting practice "in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Section 2(b) of the Act, as amended in 1982, further provides that a violation of section 2(a) occurs,

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

2. that the minority group is politically cohesive; and

3. that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752. If these preconditions are met, the Court must then determine under the "totality of circumstances" whether there has been a violation of Section 2.

The Magistrate Judge recommended that this Court grant Plaintiffs' motion for partial summary judgment as to each *Gingles* precondition. Because the Court finds the Magistrate Judge's Report thorough and well-reasoned, it is adopted in whole and incorporated into this Order. Defendants make the following objections only as to the Magistrate Judge's determination that no genuine issue of fact remains as to the third *Gingles* precondition—"white bloc-voting." The Magistrate Judge's recommendation that Plaintiffs' motion for summary judgment, as to the first two preconditions, is not contested.

## IV. Objections

First, Defendants contend that the Magistrate Judge improperly "collapsed the second and third preconditions of minority political cohesion and racial bloc voting into a single requirement that plaintiffs show 'racially polarized voting.'" (Def.s' Obj. at 4). In support, Defendants reference the Magistrate Judge's remark that "[t]he second and third preconditions are generically referred to as a showing of racially polarized voting." (Def.s' Obj. at 4 n.6 (quoting Report at 12)). The Court finds no error in either the Magistrate Judge's characterization or in his ultimate consideration of the second and third preconditions. Consistent with the law as recited by Defendants' in their own

objections, the Magistrate Judge unequivocally considered the preconditions independent of each other. The Magistrate Judge quoted the relevant language from *Gingles* detailing the factual showing required to establish both preconditions. The Magistrate Judge then separately considered the portions of Defendants' expert's testimony regarding each precondition, concluding that Dr. Weber "conceded both points [preconditions]," (Report at 13). (See Report at 13–15).

The Magistrate was clear in his separate consideration of the preconditions. At page 13 of the Report, he states, "With regard to whether minority group members constitute a politically cohesive unit . . . ." (Report at 13). In contrast at page 15, the Magistrate transitions, "With regard to the block voting by white voters . . . ." (Report at 15). Excerpts from Dr. Weber's expert deposition testimony and other evidence material to the second and third preconditions followed each respective transition. Specifically, the Magistrate Judge quoted Dr. Weber's concession of the second and third preconditions, (Report at 13–14, 15), and cited "statistics presented by Dr. Weber and Dr. Arrington [which] indicated that majority white voting is sufficient to usually defeat the combined minority voting plus white 'crossover'" votes in Charleston County," (Report at 15–16).

Moreover, it is wholly appropriate to characterize the second and third preconditions as means to a broader and more singular end. The inquiries into each, while discreet in execution, are married in purpose:

The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually

to defeat minority's preferred candidates. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices.

*Gingles,* 478 U.S. at 56, 106 S.Ct. 2752.

Accordingly, the United States Supreme Court itself defines racially polarized voting in terms of both preconditions. The Court, therefore, finds that the Magistrate Judge's characterization was appropriate and, further, that the Magistrate Judge made sufficiently independent findings as to each precondition.

Next, Defendants complain that the Magistrate Judge "imputed to Charleston County specific findings on racial polarization in State House and Senate elections made by a three-judge court in *Colleton County Council v. McConnell,* 201 F.Supp.2d 618 (D.S.C.2002)." (Def.s' Obj. at 5). Defendants argue that the Magistrate Judge should have made a more specific inquiry into the "characteristics of [the] challenged electoral system, not upon legislative or senate districts, or the level of cohesion or racial polarization in those districts." (Id.). The Magistrate Judge's alleged "reliance" on *Colleton County,* however, was complementary at best. The quoted passage from *Colleton County,* recited in the Report, simply acknowledges the statewide polarization of voting common at most electoral levels. (Report at 22). The Magistrate Judge was not imputing specific findings of polarized racial voting in legislative or senate districts to the electoral patterns of Charleston County Council elections, as Defendants would suggest, but rather referencing the general conclusion that racial polarization of voters continues to be characteristic of South Carolina elections:

Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting.

*Colleton County Council,* 201 F.Supp.2d at 640–41.

It is apparent from the Report that the findings in *Colleton County* did not form the basis of the Magistrate Judge's determination that the third *Gingles* precondition had been satisfied. Rather, the Magistrate Judge relied heavily on what he interpreted as the Defendants expert's express concession that the third *Gingles* precondition had been satisfied.

Defendants also contest this interpretation, arguing that the Magistrate Judge erroneously concluded that Dr. Ronald Weber, expert for Defendants, conceded that their was legally significant white bloc-voting such that the third *Gingles* precondition was satisfied. In support, Defendants cite, at length, Dr. Weber's deposition testimony and intimate that Plaintiffs' belabored a line of questioning concerning white-bloc voting to which Weber consistently answered that none existed to a legally significant degree. However, it is clear from the recited passages that the Magistrate Judge properly interpreted Dr. Weber's answers as a concession of the third *Gingles* precondition.

Defendants rely in part on the following exchange between the attorney for the United States and Dr. Weber:

**A:** I say: The candidates of choice of nonwhite voters are not usually defeated due to white block voting but due to partisan voting.

**Q:** When you use the word due there, are you saying that partisanship is a cause?

**A:** There is an implication of cause. I did not say are not usually defeated

because of white block voting, but because of partisan voting.

(Weber Dep. at 119–20).

Defendants argue that this exchange demonstrates that Dr. Weber "repeatedly emphasized that these election patterns were not legally significant white racial bloc voting, and repeatedly rejected the suggestion made through repetitive questions posed by the United States that minority or nonwhite voters were usually defeated due to white bloc voting." (Def.s' Obj. at 6). The Court disagrees.

It is apparent from Dr. Weber's deposition testimony that he rejected the conclusion that legally significant white-bloc voting occurred in Charleston County because he attributed the polarization to partisan differences rather than racial ones:

> **Q:** There about middle ways down in paragraph Arabic Number 4, you state: For the most part, however, these are elections where whatever racial polarization in voting exists is not politically or legally consequential in that the candidates of choice of nonwhite voters are not usually defeated due to white block voting, but due to partisan voting.
>
> **A:** Yes, sir.

(Weber Dep. at 114).

■ Issues of causation, however, are not relevant to the issue of white bloc-voting. The third precondition requires only that "the minority ... demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752 (citation omitted). Importantly, the United States Supreme Court in its plurality opinion expressly stated that "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent." *Gingles,* 478 U.S. at 62, 106 S.Ct. 2752. Rather, racially polar-

ized voting "means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is it refers to the situation where different races ... vote in blocs for different candidates." *Id.* More specifically, the Supreme Court defines racial polarization as "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently." *Id.* at 53 n. 21, 106 S.Ct. 2752 (internal citations and quotations omitted). As the Magistrate rightly noted, the Fourth Circuit Court of Appeals agrees that "the best reading of the several opinions in *Gingles,* is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions, ... but relevant in the totality of circumstances inquiry." *Lewis v. Alamance County, North Carolina,* 99 F.3d 600, 615 n. 12 (1996). Defendants ask the Court to revisit the Fourth Circuit's conclusion in *Lewis* and find instead that causation is in fact relevant to the third *Gingles* precondition. (Def.s' Obj. at 19). The Court, however, declines to entertain Defendants' request to reconsider *Lewis,* not simply out of deference to *stare decisis* but because the Court wholly concurs with the Fourth Circuit's interpretation of *Gingles.*

Dr. Weber's conclusion that the polarization of voters is caused by partisan differences, therefore, is simply not relevant to whether the third precondition has been satisfied. The above cited testimony crystalizes the confusion Defendants' have over the Magistrate Judge's interpretation of Dr. Weber's answers. While Defendants and Dr. Weber appear convinced that inquiry into the third precondition includes questions of causation, the Magistrate Judge rightly ignored such answers and instead focused on Dr. Weber's answers to a more narrowly tailored hypothetical, used by Plaintiffs' attorney to focus Dr. Weber on the relevant inquiry of white-

bloc voting *without regard to cause.* Defendants contest the hypothetical for failing to properly consider the entire law of a Section 2 case, including cause. Their objection, however, as stated, misapprehends the specific inquiry this Court must make into white-bloc voting. The hypothetical and corresponding dialogue are quoted in relevant part:

> **Q:** Let me ask you a hypothetical. Assume that to carry our burden under the ... third *Gingles* preconditions, we, the plaintiffs, must prove the following: ... that usually white voters vote for candidates different than the ones preferred by minority voters, and the candidates supported by the white voters win. Okay?
>
> **A:** Okay.
>
> **Q:** Further assume that all the plaintiffs have to prove—that's all the plaintiffs have to prove in a Section 2 case and that we do not have to prove that the reason or the cause of the polarization is race. Okay?
>
> **A:** Um-hum.
>
> **Q:** If that is the correct legal standard, based upon the hypothetical question that I've given you, and based upon your study in this case, using your working rules, isn't it true that the Court would conclude that voting is racially polarized in County Council questions?
>
> [Defense counsel, Mr. Griffith objects to the question for omitting material required elements of a Section 2 case.]
>
> **By Mr. Coates:** I'm not asking about whether or not we win. Mr. Griffith is correct. My question is only on the basis of that standard. If the Court decides that that standard is correct rather than the one that you've suggested in your report, then based upon your studies in this case, isn't true that the Court would conclude that voting is racially polarized in

Charleston County for County Council elections?

> [Defense counsel objected again.]
>
> **The Witness:** Yeah I mean -
>
> **By Mr. Coates:**
>
> **Q:** I can ask it again if you want.
>
> **A:** No, you don't need to ask it again because I clearly understand it. The difficulty I have is, you know, it's a hypothetical. So I'll accept it as a hypothetical because that is not the law. The law is totality of circumstances. It's been totality of circumstances in all these Section 2 cases.
>
> **Q:** My question is simply on the issue of racial polarization.
>
> **A:** On the simplistic notion that is involved in the preconditions of *Gingles,* your case would continue to be alive because you have met the first prong. You can demonstrate, based on my analysis, that you can draw one district that is African–American in voting majority. You've got cohesion on the part of the minority community; and the preferences, be they Republican or whatever they are, where white voters do not support the Democrats, where the candidates of choice of the African–Americans are not white voters. So your case would continue to be alive to go with the totality of circumstances.
>
> **Q:** And another way of saying that is based upon—if that is the correct standard in my hypothetical, based upon your studies and your working rules of the evidence would indicate that there is racial polarization in elections for Charleston County Council?
>
> **A:** There are racial difference in voting, not racial polarization.

(Weber Dep. at 139–42)

The hypothetical was Plaintiffs attorney's attempt to separate the element of

causation from Dr. Weber's conclusions regarding the third precondition. As stated, Dr. Weber believes that the stratification of white and black voters in Charleston County is a consequence of partisan differences as opposed to racial differences and he repeatedly insisted on this conclusion notwithstanding Plaintiffs attorney's attempt to focus the inquiry, as is consistent with the law regarding the third precondition, on the issue of polarization *regardless of cause.* The hypothetical simply forced Dr. Weber to concede, regardless of his personal interpretation of the law, that the preconditions of *Gingles* were satisfied on the facts of this case and that the totality of the circumstances inquiry was all that remained. Not only was the Magistrate Judge correct in his interpretation of Dr. Weber's answers, but Plaintiffs attorney acted properly in pursuing the line of questions as he did.

## V. Objections as to Plaintiffs' burden of proof

Finally, Defendants make a series of objections in regards to Plaintiff's alleged failure to satisfy their burden of proof as to the third *Gingles* precondition. While the Court finds that Dr. Weber's express concession eliminates any issue of fact as to the third precondition, (as all experts therefore agree it has been satisfied), out of an abundance of caution, the Court makes the following additional remarks in response.

■ First, Defendants proffer what the Court would characterize as rather anecdotal, deposition testimony of candidates who testify to being minority-preferred candidates. (See Def.s' Obj. at 10–13). The Court finds such evidence to be generally unpersuasive. Even assuming, as the Court must, that such perceptions were true, "minority-preferred candidate" means something more quantitative than simply what an individual candidate may

or may not perceive about him or herself in regards to the preferences of voters. Rather, the Court will focus on the weight of the statistical data presented in Dr. Weber's and Dr. Arrington's respective reports regarding the electoral success, failure, and classification of minority-preferred candidates.

Next, Defendants contend that Plaintiffs, in contradiction of the Fourth Circuit decision in *Lewis v. Alamance County,* 99 F.3d 600 (4th Cir.1996), "excluded 30 years of primary elections from its analysis, including those in which the minority-preferred candidate won and those in which he or she did not, and [that] the Magistrate disregarded such overwhelming evidence altogether." (Def.s' Obj. at 13). It is true that *Lewis* clearly warns, "results in these two phases [primary and general] of the single election cycles must be separately considered and analyzed." *Lewis,* 99 F.3d at 616. However, the express purpose of such inquiry is to avoid the risk of "masking regular defeat in one of these phases with repeated successes in the other, and thereby misperceiving a process that is palpably in violation of the Voting Rights Act, as not violative of the Act at all." *Id.* To illustrate, the Fourth Circuit stated:

an at-large voting method under which the candidates preferred by the minority community are always successful in the primary election but, because of white bloc voting, are always defeated in the general election . . . , is a voting method under which minorities are, because of white bloc voting, always unsuccessful in attaining elective office.

*Id.*

■ The Fourth Circuit reasoned that "[b]y aggregating primary and general elections . . . a court would ineluctably find in both circumstances that minority-preferred candidates were successful fifty

percent of the time, and therefore not 'usually' defeated by white bloc voting." *Id.* Ironically, that is precisely the conclusion that Defendants' ask the Court to make in the instant case. Notwithstanding their own expert's conclusion that minority preferred candidates lose in general elections to a legally significant degree, Defendants would have the Court consider success of minority preferred candidates in primary elections as evidence that racial polarization does not occur. This is precisely the type of aggregation of evidence of which the Fourth Circuit warned and in which the Court will not participate. To do otherwise and weigh primary success more heavily in the Court's calculus, would improperly dilute the experts' statistically-derived conclusion that regardless of primary successes in Charleston County, minority-preferred candidates continue to experience legally significant defeat in general elections. (See, e.g., Weber Report at 53–54). Although the Court is unpersuaded to change its conclusion, it should be noted that the expert Reports include data regarding primary elections which the Court has thoroughly considered.

Defendants also strangely contend that the "effective result of ignoring a thirty year history of electoral success by minority-preferred candidates was to assumes [sic] that the only candidates who can be labeled 'minority-preferred candidates' are members of the minority, and to indulge in racial stereotyping that tramples on the principles embodied in the Equal Protection Clause." (Def.s' Obj. at 13). To begin, even if thirty years of electoral success had been ignored, it does not necessarily follow that Plaintiffs' or the Magistrate therefore assumed that "only candidates who can be labeled 'minority-preferred candidates' are members of the minority," (id.). Moreover, the allegation is completely unsubstantiated, as the record proffered by

Plaintiffs and reviewed by the Magistrate Judge and this Court includes every general election contest for Charleston County Council from 1988 to 2000, as analyzed by Defendants' own expert, regardless of the race of the minority-preferred candidate or the race of his or her opponent. The objection is without merit.

Defendants also contest Plaintiffs alleged reliance on the bivariate ecological regression analysis for the estimation of voter candidate-preferences. Defendants rightly note that the method has been criticized. *See Lewis*, 99 F.3d 600(1996). The Fourth Circuit in *Lewis* cautioned against "overreliance on bivariate ecological regression analysis in the estimation of voter preferences ... [because] [b]ivariate regression analysis ... only allows one to determine the correlation between the percentage of the vote received by a particular candidate and the racial composition of precincts." *Id.* at 605 n. 3. The Fourth Circuit concluded that in a sense "the bivariate ecological regression analysis merely assumes that which it is the purpose of the analysis to prove." *Id.* Notwithstanding the Fourth Circuit's cogent warning, the Supreme Court has previously endorsed both the bivariate ecological regression and the extreme case statistical methods. *Gingles*, 478 U.S. at 52–61, 106 S.Ct. 2752. More important, experts for Plaintiffs and Defendants prudently employed both statistical methodologies. Defendants have not explained how, or even alleged that, conclusions regarding voter preferences are different under the extreme case method as opposed to those reached using bivariate ecological regression. In fact, the Court has reviewed the statistical data produced by each method and finds the results to be consistently within 1–3 percentage points of each other. (Attachment JCR–4). Dr. Weber expressly acknowledges that he used both methods, (Weber Report, dated October 8, 2001,

at 12), and yet draws no distinctions in the conclusions drawn from each. Ultimately, to the extent the bivariate ecological regression methodology may have yielded "self-fulfilling" statistical data in this case, the Court's conclusions remain shielded from overreliance upon such deficiencies by the expert's complimentary use of both methods.

## VI. Additional findings as to the third *Gingles* precondition

As stated, Dr. Weber's express concession that the third *Gingles* precondition has been satisfied eliminates any issue of fact as to the existence of white bloc-voting. However, the Court highlights the following statistical conclusions as clearly satisfying Plaintiffs' burden of proof as to the third *Gingles'* precondition:

1. As far as polarization in voting between the two groups is concerned, I find that in 25 of the 33 elections, there was evidence of polarization in voting (about 75.8 percent of the elections were polarized) in that non-white voters preferred Democratic candidates, while white voters preferred Republican candidates.

(Weber Report, dated October 8, 2001, at 53).

2. ... in 78.6 percent of elections where non-white voters acted cohesively, the group was defeated in electing a candidate of choice to the County Council office.

(Id. at 54).

3. ... white voters were cohesive ... in 31 of the 33 elections.

(Id. at 42).

■ "There is no simple doctrinal test for the existence of legally significant racial bloc voting." *Gingles,* 478 U.S. at 58, 106 S.Ct. 2752. The Fourth Circuit has stated that the third *Gingles* precondition is not satisfied simply by a showing that "the white bloc voting defeats the minori-

ty-preferred candidate more often than not." *Lewis,* 99 F.3d at 606 n. 4. "[S]uffice it to say that [it] mean[s] something more than just 51%." *Id.* The Fourth Circuit referenced Justice O'Connor's conclusion that a finding of " 'usually defeated' should be based on a success rate by minority-preferred candidates that is less than proportional representation, although greater than mere tokenism." *Id.*

As a guidon, the Supreme Court has stated that "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election" and that "the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles,* 478 U.S. at 57, 106 S.Ct. 2752.

■ In the instant case, the Court finds the statistical data over the most recent 12 year period to be uniformly significant: cohesion in white voting eclipsed 90%; non-white voters were defeated in 78.6% of the elections where they acted cohesively; and elections were polarized in excess of 75% of endogenous, general elections considered. The Court concludes that by any measure these numbers are legally significant. Moreover, Dr. Weber, Defendants' own expert, has admitted that on the basis of these findings, Plaintiffs' "case would continue to be alive to go with the totality of circumstances." (Weber Dep. at 142).

Dr. Weber only argues that these statistics do not "produce a picture of legally significant vote dilution" because they are "attributable to race-neutral causal factors." (Weber Report, dated October 8, 2001, at 54). As stated, however, causation is irrelevant to the inquiry.

Although Defendants now also contest the span of years analyzed as deficiently

short, it was their own expert that intentionally limited the elections considered to those most recent, while experts for Plaintiffs considered elections from 1984 to 2000. Defendants' expert purposefully declined to consider pre–1988 elections "because numerous Federal courts have held that recent elections for endogenous offices are the most probative in determining vote dilution . . . ." (Weber Report, dated October 8, 2001, at 9–10). The Court agrees that the most recent elections are most probative. *See, e.g., Ruiz v. City of Santa Maria,* 160 F.3d 543, 555 (9th Cir. 1998); *Uno v. City of Holyoke,* 72 F.3d 973, 990 (1st Cir.1995); *Meek v. Metropolitan Dade County, Fla.,* 985 F.2d 1471, 1482–83 (11th Cir.1993). In fact the Supreme Court in *Gingles* affirmed the district court's finding of a Section 2 violation on the strength of only three election cycles. *Gingles,* 478 U.S. at 52, 106 S.Ct. 2752.

The record considers 33 probative, endogenous, general elections. The Court concludes that in a legally significant portion of those elections white bloc-voting was sufficient to defeat the combined efforts of non-white voters and any white crossover votes. Defendants' expert admits no less. Accordingly, Plaintiffs' motion for summary judgment as to the third precondition is granted.

### CONCLUSION

It is, therefore,

**ORDERED,** for the foregoing reasons that the Court adopts in whole the Report and Recommendation of the Magistrate Judge and incorporates the Report by specific reference into this Order. It is further **ORDERED** that Plaintiffs' Motion for Partial Summary Judgment is **GRANTED.**

### AND IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

CARR, United States Magistrate Judge.

These actions were brought on January 17, 2001, by The United States of America and several individual Plaintiffs against Charleston County, South Carolina (the County), the Charleston County Council (County Council), the Charleston County Election Commission, and several individual Defendants under Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982. 42 U.S.C. § 1973 [1], ( hereinafter " § 2"), to cure alleged vote dilution caused by the existing at-large method of election for seats on County Council. Discovery was completed in a reasonably expeditious and cooperative manner; mediation has been unsuccessful, and the parties are ready for trial. Three pending mo-

---

1. As amended in 1982, Section 2 of the Voting Rights Act of 1965, provides:

   (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b) of this section.

   (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

tions have been referred for a Report and Recommendation to the undersigned United States Magistrate Judge by United States District Judge P. Michael Duffy; the motions are: the Plaintiffs' motion for partial summary judgment on the *Gingles* factors; the Defendants' motion for summary judgment on the third *Gingles* factor and the totality of circumstances and the Plaintiffs' motion for a preliminary injunction to halt or to impose an interim voting plan for the June 11, 2002, primary election for five open seats on the Charleston County Council.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue exists when there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a properly supported summary judgment motion bears the burden of establishing the existence of a genuine issue of material fact. *See, e.g., id.* at 248–49, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

The Supreme Court has stressed that Rule 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In reviewing a grant of summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *See, e.g., Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001).

However, a nonmoving party may not meet its burden by resting upon mere allegations or bald assertions in the pleadings. Instead, the "party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also, Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Rule 56 requires that a nonmoving party's supporting affidavits be based on personal knowledge and set forth facts that would be admissible in evidence at a trial. Fed. R.Civ.P. 56(e). Therefore, statements based solely on information and belief do not satisfy the requirements of Rule 56. *See, e.g., Toro Co. v. Krouse, Kern & Co.,* 827 F.2d 155, 162 & n. 3 (7th Cir.1987); *Minn. Mining & Mfg. Co. v. United States Rubber Co.,* 279 F.2d 409, 415 (4th Cir. 1960). Likewise, hearsay statements, which would be inadmissible, do not meet Rule 56's standards. "Mere speculation by the non-moving party cannot create a genuine issue of material fact" sufficient to survive a motion for summary judgment. *Cox,* 249 F.3d at 299.

### § 2 of the Voting Rights Act of 1965

Section 2(a) of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), prohibits a State or its political subdivisions from imposing any voting practice in a manner which results in denial or abridgement of the right of any citizen of the United States to vote on account of race or color. Following the plurality decision of the United States Supreme Court in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which required proof in voting rights cases of actual intent to discriminate against minority voters, Congress passed the 1982 Amendments to the Voting Rights Act of 1965 including amendments to § 2(b) to restore the "results test," the legal standard that governed voting dis-

crimination cases prior to *Mobile v. Bolden, Id.* Under the "results test," Plaintiffs were not required to demonstrate that the challenged electoral law or structure was designed or maintained for a discriminatory purpose. In restoring the "results test" Congress essentially provided that Plaintiffs could prevail in a voting rights case by showing that, under the totality of the circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process.

The Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), construed for the first time § 2 and concluded,

> The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. This Court has long recognized that multimember districts and at-large voting schemes may " 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.' " .... The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.... Multimember districts and at-large election schemes, however, are not per se violative of minority voters' rights.... Minority voters who contend that the multimember form of districting violates § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.

106 S.Ct. 2752, 2764–2765 (citations and footnotes omitted).

While recognizing that § 2 requires consideration of the totality of the circumstances, many of which are listed in S.Rep. No. 97–417, at 28–29, 97th Cong.2nd Sess. 28 (1982), U.S.Code Cong. & Admin. News 1982, pp. 177, 206–207 (hereinafter S.Rep.), the court concluded that unless there is a conjunction of three circumstances, known as the *Gingles* preconditions, the use of multi-member districts generally will not be violative of § 2. *Gingles* at 2766.

Ultimately in this case the court must assess the impact of the multi-member and at-large electoral structure in Charleston County Council elections on minority electoral opportunities using objective factors reflecting the totality of the circumstances.

### Plaintiffs' Motion for Partial Summary Judgment On the First, Second and Third *Gingles* Preconditions

The United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), concluded that three circumstances are necessary preconditions for multi-member districts to operate to impair minority voters' ability to elect representatives of their choice.

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates. Cf. *Rogers,* 458 U.S., at 616, 102 S.Ct., at 3275. See also, Blacksher & Menefee 51–56, 58; Bonapfel 355; Carpeneti 696; Davidson 4; Jewell 130. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure

thwarts distinctive minority group interests. Blacksher & Menefee 51–55, 58–60, and n. 344; Carpeneti 696–697; Davidson 4. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, see, infra, at ——, and n. 26—usually to defeat the minority's preferred candidate. See, e.g., Blacksher & Menefee 51, 53, 56–57, 60. Cf. *Rogers,* supra, at 616–617, 102 S.Ct., at 3274–3275; *Whitcomb,* 403 U.S., at 158–159, 91 S.Ct., at 1877; *McMillan v. Escambia County, Fla.,* 748 F.2d 1037, 1043 (C.A.5 1984). In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

106 S.Ct. 2752 at 2766–2767

The Plaintiffs here assert that there is no genuine issue of material fact as to the existence of these three preconditions. They note that their experts confirm the existence of the pre-conditions as does the defendants' expert. However, in accord with summary judgment standards at oral arguments, the Plaintiffs' relied primarily on the deposition testimony the Defendants' expert, Dr. Ronald E. Weber. The Defendants oppose the motion as to all three pre-conditions and have also moved for summary judgment on their own part as to the third pre-condition.

**First Pre–Condition The Minority Group Must Be Able to Demonstrate That It Is Sufficiently Large And Geographically Compact To Constitute A Majority In A Single–Member District.**

The purpose of this pre-condition was explained authoritatively by the Fourth Circuit Court of Appeals in the unpublished decision of *Gause v. Brunswick County, N.C.* 92 F.3d 1178 (Table, Text in WESTLAW), Unpublished Disposition, 1996 WL 453466, *2:

> "The reason that a minority group making a [vote dilution] challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles,* 478 U.S. at 50–51 n. 17, 106 S.Ct. 2752 (emphasis in original). In other words, minority voters must show that their votes have been diluted by discriminatory elements of the election process, and not simply that their votes are dilute. See *DeGrandy,* 114 S.Ct. at 2659–60, 114 S.Ct. 2647; *McNeil,* 851 F.2d at 946. "[T]he adverse 'result' for which [Section 2] seeks a remedy must be traceable ultimately to the impact of 'a certain electoral law, practice, or structure interact[ing] with social and historical conditions.'" *McGhee,* 860 F.2d at 117 (quoting *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752) (emphasis supplied).

1996 WL 453466, *2.

In the case at bar virtually every expert agreed that the first precondition is satisfied. Dr. Ronald E. Weber, the Charleston County Council's expert witness, testified in deposition on November 28, 2001, as follows:

> Q. And if a district can be created that's compact and constitutional and has a majority of minority voters in it and one such district can be created in the jurisdiction under challenge, does that, in your opinion, satisfy the first *Gingles* precondition?
>
> A. Yes.

Q. And were you able to create a majority black compact district in Charleston County in which black people were the majority of voters living in that district?

A. Yes.

Q. And would you agree with me that on the basis of your work in this case that the first *Gingles* precondition is satisfied in Charleston County?

A. Yes, it is satisfied.

Weber Dep. at p. 15 l. 8–24.

Dr. Theodore Arrington, the Plaintiffs' expert, concluded that three such single member majority black districts could be drawn in Charleston County. Arrington Rep. at 43–46, Table 17, & App. D. On March 20, 2002, a three judge panel of this court issued its Order in *Colleton County Council v. McConnell,* No. 01–3581, establishing a redistricting plan for the South Carolina Senate which creates at least one predominantly black district wholly within Charleston County.

At oral arguments, Charleston County Council took the position that the black population of Charleston County was so integrated within the white population or was so small in relation to the surrounding white population that it could not constitute a majority in a single member district. Further it presented an affidavit from Dr. Weber [2] dated March 26, 2002, contradicting his deposition testimony and stating, "It is my opinion that the United States cannot carry its burden of proving the first *Gingles* precondition of geographical compactness." Weber Declaration ¶ 4. Further he explained that while the black majority single member district which he had drawn had been drawn in a color-blind manner, it might be subject to constitutional challenge because it was drawn without giving consideration to maintain-

ing identified communities of interest, or other districting principles such as keeping political subdivision boundaries. While he accurately asserts that the first *Gingles* precondition cannot be met by presenting a district which would not survive subsequent constitutional examination on other grounds, he only surmises that the color-blind, black majority single member district which he drew would not pass constitutional scrutiny because he did not consider other constitutional requirements in drawing it. Indeed at oral argument the Defendants asserted that Dr. Weber had not been asked to make such an evaluation of the single member district he drew, and he has not made such an evaluation.

This ad hoc speculation by Dr. Weber is insufficient to avoid summary judgment. First, the law in this circuit is clear that a party cannot avoid summary judgment by filing affidavits that contradict the affiant's own prior testimony. *Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432, 438 (4th Cir.1999) ("we have consistently held that a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit"). In *Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 975 (4th Cir.1990), the court held that where an affidavit conflicts with a witness's prior testimony, "the affidavit should be disregarded as a sham issue of fact." Second, though the burden of proof rests initially with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See, First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

---

**2.** The Plaintiffs' objected to Dr. Weber's affidavit as contradictory to his deposition and presented after the close of discovery. The objection is well taken.

Genuineness means that the evidence must create fair doubt; wholly speculative assertions such as those presented in the Weber affidavit will not suffice. *See, Cole v. Cole,* 633 F.2d 1083, 1089 (4th Cir.1980); *Atlantic States Construction Co. v. Robert E. Lee & Co.,* 406 F.2d 827, 829 (4th Cir. 1969).

A review of this record reveals no evidence on which a reasonable jury could rely to return a verdict for the nonmoving party on the first *Gingles* pre-condition.

**Second And Third Pre–Condition The Minority Group Must Be Able To Show (2) That It Is Politically Cohesive And (3) That The White Majority Votes Sufficiently As A Bloc To Enable It Usually To Defeat the Minority's Preferred Candidate.**

The second and third preconditions are generically referred to as a showing of racially polarized voting. Justice Brennan delivering the opinion of the court in *Thornburg v. Gingles,* 106 S.Ct. 2752, 2756 (1986), explained the importance of the two conditions as follows:

> The relevance of the existence of racial bloc voting to a vote dilution claim is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate. Thus, the question whether a given district experiences legally significant racial bloc voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and consequently establishes minority bloc voting within the meaning of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences significant polarization than are the results of a single election. In a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one election or a few elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election. Here, the District Court's approach, which tested data derived from three election years in each district in question, and which revealed that blacks strongly supported black candidates, while, to the black candidates' usual detriment, whites rarely did, satisfactorily addresses each facet of the proper standard for legally significant racial bloc voting.

106 S.Ct. 2752, 2756.

Once again the Plaintiffs rely on the testimony of the Defendants' expert, Dr. Weber, who conceded both points. With regard to whether minority group members constitute a politically cohesive unit he allowed:

> Q. If you apply your working rules, would you agree with me that the second *Gingles* precondition is satisfied in this case on the basis of the elections that you have looked at?
>
> A. We have cohesion on the part of nonwhite voters in support of Democratic candidates irrespective of whether or

not the Democratic candidates are African–American or white.

Q. If the second—if I'm defining the second *Gingles* precondition correctly, and I'm defining it as proof of minority voter cohesion, wouldn't you agree with me that applying your rules, based upon your analysis, that that second precondition is satisfied in Charleston County?

A. Yes, but I want the record to reflect that it's cohesion in support of Democratic candidates.

Q. Okay. And do you know of any case authority since *Gingles* or before *Gingles* that says that if the minority cohesion that you look for under the second precondition is in favor of candidates of one party, that that doesn't count in satisfying the second precondition?

A. No, but-

Q. That wouldn't make any sense, would it?

A. No, it wouldn't make any sense. But the point I make about the partisanship is because when we get to the third precondition, we're going to discover that the other group prefers the other party. And that involves the issue of whether it's partisanship or race that's underlying the differences between the two groups.

Q. If you said that cohesion on the part of minority voters did not count if they were always cohesive in support of one party, then African–American voters would, as a practical matter, never satisfy the second *Gingles* precondition, would they, in the South because almost always their cohesion is behind Democratic party candidates; correct?

A. Everywhere in the country. In the general election, they are cohesive. African–American or nonwhite voters are cohesive behind Democratic candidates.

Q. The fact that that happens in Charleston County makes Charleston County no different than any other ju-

risdiction that you know of in the country; correct?

A. That is correct, yes, no different.

Q. Isn't it the case that candidates of choice of African–American voters are usually defeated in Charleston County Council general elections?

A. Candidates of choice of minority voters are usually defeated, yes.

Weber Dep. at p. 73–75.

With regard to the block voting by white voters, Dr. Weber testified,

Q. My question is simply on the issue of racial polarization.

A. On the simplistic notion that is involved in the preconditions of *Gingles*, your case would continue to be alive because you have met the first prong. You can demonstrate, based on my analysis, that you can draw one district that is African–American in voting majority. You've got cohesion on the part of the minority community; and the preferences, be they Republican or whatever they are, where white voters do not support the Democrats, where the candidates of choice of the African–Americans are not white voters. So your case would continue to be alive to go with the totality of circumstances.

Weber Dep. at p. 142.

To be sure Dr. Weber believed that racial polarization was an inappropriate term and that racial differences should be substituted; he nonetheless conceded that "[o]n the simplistic notion that is involved in the preconditions of *Gingles*," the Plaintiffs' burden was met.

Furthermore statistics presented by Dr. Weber and Dr. Arrington indicated that majority white voting is sufficient to usually defeat the combined minority voting plus white "crossover" votes in Charleston County. *See,* Weber Rep. at 39–41 (From 1988 to present in endogenous general and special elections 79% of the minority preferred candidates, regardless of the candi-

date's race, lost the election), Arrington Rep., App. B, Table 55 (In 1989 referendum 99% of the minority vote was defeated by 76% of the white vote). Finally, in *Colleton County Council v. McConnell*, 201 F.Supp.2d 618, racial polarized voting was not seriously in dispute, and this court noted, "Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting." 201 F.Supp.2d at 641–42.

During his deposition and in his post hoc affidavit, Dr. Weber takes the position that the polarized voting is not based upon race, but is based on a number of other factors which he generally alluded to but among which partisanship is cited predominantly. He also takes the opportunity to challenge the statistical analysis of the Plaintiffs' expert using the bivariate ecological regression analysis. Indeed in his affidavit Dr. Weber states, "Because most non-white voters are Democrats and there is a pro-Republican tilt among white voters, there appears to be a strong correlation between the race of the voter and the partisan choice of the voter." Weber Declaration ¶ 9. In other words, the polarization is because of political persuasion rather than race.

This argument as it relates to the third *Gingles* precondition is not relevant in this circuit. The Fourth Circuit Court of Appeals in *Lewis v. Alamance County, North Carolina*, 99 F.3d 600 (1996), rejected just such an argument on the strength of *Gingles* stating,

> [U]nder Plaintiffs' theory, the district court would be required, contrary to *Gingles*, to assess the cause of the minority community's support of the candidate in determining whether the minority-preferred candidates usually are defeated by white bloc voting. See infra note 12. In *Gingles*, defendants argued that the Plaintiffs were required to use multiple regression analysis, rather than bivariate regression analysis, to ensure that only those defeats of black-preferred candidates that were actually caused by race, and not some other reason such as party affiliation, were considered defeats of black-preferred candidates for purposes of a vote dilution claim. The *Gingles* plurality explicitly rejected such a requirement in the context of assessing the second and third *Gingles* preconditions. 478 U.S. at 62, 106 S.Ct. at 2772. [FN12]

FN12. Although only a four-Member plurality joined Section III(C) of the opinion, in which the rejection of defendant's multiple regression claim is found, Section III(C) is lengthy, and the dispute that cost Justice White's vote on the section was not over the "cause" issue. Although most of our sister circuits have by now adopted the position that an inquiry into cause is relevant, see, e.g., *LULAC*, 999 F.2d at 850 ("[The] rigorous protections [of the Voting Rights Act], as the text of § 2 suggests, extend only to defeats experienced by voters 'on account of race or color.' "), they are still in disagreement about the stage in the vote dilution inquiry in which causation evidence is appropriate, compare *Nipper*, 39 F.3d at 1515 ("[I]f the evidence shows, under the totality of the circumstances, that the community is not motivated by racial bias in its voting patterns, then a case of vote dilution has not been made."), *with Clarke*, 40 F.3d at 812–14 (considering "cause" of the success rate of black-preferred candidates in assessing third *Gingles* element). We think the best reading of the several opinions in *Gingles*, however, is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions, *see Gingles*,

478 U.S. at 62, 106 S.Ct. at 2772 (Brennan, J., plurality opinion), but relevant in the totality of circumstances inquiry, see 478 U.S. at 100, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment) (agreeing that use of racial polarization data "solely" to prove *Gingles* second and third elements cannot be rebutted by "evidence that the divergent racial voting patterns may be explained in part by causes other than race," but disagreeing with plurality's claim "that such evidence can never affect the overall vote dilution inquiry."). Of course, whether causation is relevant to the second and third precondition inquiries or to the totality of circumstances inquiry, it would be just as relevant for determining whether particular minority-preferred candidates lose for some reason other than racial polarization, as it would be for determining, as Plaintiffs urge, whether particular minority-preferred candidates win merely because of party affiliation.

99 F.3d 600, 615.

Here viewing the Defendants' own expert testimony all but one of the 23 losing nonwhite candidates of choice lost to a candidate who received 60% or more of the white votes, a level which Dr. Weber described as white cohesion. As Dr. Weber conceded, "Candidates of choice of minority voters are usually defeated." Weber Dep. p. 75, 1. 145–146.

Accordingly, in Dr. Weber's words, "So [the Plaintiffs'] case would continue to be alive to go with the totality of circumstances." Weber Dep. at p. 142.

**Defendants' Motion for Summary Judgment On The Third *Gingles* Precondition [3] And Totality Of Circumstances**

In accord with the requirements of § 2, the court must consider the totality of the circumstances in deciding whether there has been a violation of the Voting Rights Act. The Senate Report contains a non-exclusive listing of circumstances (hereinafter, "The Senate factors") to be considered, and the Supreme Court in *Gingles* listed them as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of

---

**3.** Given the above discussion on the Plaintiffs' motion with regard to the *Gingles* third precondition, it is not necessary to discuss it further here.

Plaintiffs' evidence to establish a violation are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group", "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous". S.Rep., at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206–207.

*Gingles* 478 U.S. at 37, 106 S.Ct. at 2759.

The Defendants' assert in this motion that there is no genuine issue of material fact concerning the totality of the circumstances and that they are entitled to judgment as a matter of law.

Consideration of the totality of the circumstances is a highly fact intensive inquiry, and a cursory review of the factors listed in the Senate Report reveals disputes which may only be resolved by the ultimate fact finder. The Senate factors with examples of genuine issues of material fact or other matters for consideration by the fact finder follow.

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

The Defendants concede that Charleston County and the State of South Carolina have histories of official discrimination, but dispute that it continues today to impede the right of the members of the minority group with regard to voting.

The Plaintiffs point to testimony to the contrary. For example, Charleston County Elections Commission Attorney from 1968 until 1997, Joseph Mendelsohn, testified that he dealt with a consistent pattern of harassment at predominantly black precincts "in every single election we had."

Mendelsohn Dep. p. 31. Similarly current Charleston County Elections Commissioner Carolyn Collins testified that there was usually an attempt made to have both Democratic and Republican poll watchers at each precinct, but because of a small number of black Republican poll watchers, the Republican poll watcher in predominantly black precincts was often white. On the other hand there were some predominantly white precincts where there was never a black poll watcher. Collins testified that there were some white poll managers who felt uncomfortable being in a predominantly black precinct. Accordingly white poll watchers for black precincts were selected for their "tendency to be aggressive and assertive in a black environment." Collins Dep. p. 44. She further testified that black voters reported being intimidated or harassed by the white poll watcher.

While this evidence and other similar evidence alone does not prove the Plaintiffs' case, it creates a sufficient issue for resolution by a fact finder.

2. The extent to which voting in the elections of the state or political subdivision is racially polarized.

"Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting." *Colleton County Council v. McConnell,* 201 F.Supp.2d at 641–42 (2002).

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

The Plaintiffs as the non-moving parties presented undisputed evidence that

Charleston County is one of the largest and most populated counties in the state and the cost and logistical problems of running a county wide race fall most heavily on the minority candidate. Thus the Charleston County Council method of election enhances the opportunity for discrimination against the economically disadvantaged minority group. *See*, Amos–Frazier Dep. at 79–80 (the amount of money it takes to run and get your name out there over this county, the average African–American does not have that kind of money in their campaign to do it.); Floyd Dep. at 71. (Running county wide is hard, it's expensive).

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process.

Charleston County does not use a slating process, so this factor is not relevant.

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

The Defendants' expert concedes that African–Americans in Charleston County participate in the political process at lower rates than whites in Charleston County, and the evidence cited in the Plaintiffs' brief concerning the effects of discrimination is undisputed. "According to the 1990 Census, which is the most recently available Census data regarding socio-economic matters, socioeconomic disparities divide white and black residents of Charleston County... 70.3% of Charleston County's citizens living in poverty are black... Black per capita income is less than half of that earned by whites: $7,106 vs. $16,339... Black median family income also trails that of white families by more than half $18,603 vs. $38,052... Over 31%

of black families live below the poverty line versus 5.0% of white families... Similarly, more than a third of Charleston County's black persons (34.2%) live below the poverty line versus 7.9% of the County's white persons... Over 41% of the County's black residents have income levels below 125% of the poverty level versus 10.6% of the County's white residents... Moreover, approximately one of every six black families (16.9%) in Charleston County receive public assistance income; conversely, approximately one of 50 white families (2.3%) receive such assistance." Plaintiffs' Memorandum In Support of Its Motion, p. 34.

6. Whether political campaigns have been characterized by overt or subtle racial appeals.

Again the undisputed evidence from the Plaintiffs is that non-minority candidates have displayed photos of their black opponents prominently in campaign literature and sometimes darkened pictures to emphasize the racial distinction. *See*, B. Fielding dep. at 51–52, 76–77, 236–38; Fowler dep. at 129–31; Runyon dep. at 103–04; dep. of former N. Charleston NAACP president Ed Bryant at 197–99, 200–01.; dep. of State Senator McKinley Washington at 75–76; Rosen dep. at 82–83.

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

The evidence here is undisputed. In considering endogenous elections, that is those elections for County Council, since 1988 the minority has been particularly unsuccessful in electing its preferred candidate. When considering exogenous elections, those outside of the elections for county council, the minority is much more successful. Extensive statistical data has been presented and debate has arisen over the proper analysis to be undertaken.

## 8. Additional Factors

The Defendants have presented an array of additional factors which they argue establish that particular minority-preferred candidates lose for some reason other than racial polarization.

First and foremost is partisan politics and party affiliation. *See,* Rosen depo. pp 31, 60, 74, 77–78, 90–91, 94 (Black voters are Democrats. Democrats are out of power. So, therefore, black people suffer the same indignities as white Democrats.); Weber depo. pp 44–45, 53–54, 58, 63, 292 (the African–American nonwhite voters prefer Democrats. The white voters typically prefer Republicans.)

The issue of cause, while treated by the Fourth Circuit as just one of the circumstances rather than incorporated in the *Gingles* test, is Defendants' principal defense. And partisan politics as cause for the electoral disparity in Charleston County Council elections is strongly supported by the record, but in a totality of the circumstances analysis, partisanship cannot be the sole determinant.

The ultimate issue is whether "the political processes ... were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White v. Regester,* 412 U.S. 755, 765–766, 93 S.Ct. 2332, 2339–2340, 37 L.Ed.2d 314 (1973). As in gerrymandering cases, "it is not mere suffering at the polls but discrimination in the polity with which the Constitution is concerned." *Shaw v. Reno,* 509 U.S. 630, 661, 113 S.Ct. 2816, 2835, 125 L.Ed.2d 511 (1993) (White, J., dissenting). " '[T]he question whether the political processes are "equally open" depends upon a searching practical evaluation of the "past and present" reality,' " *id.,* at 30, U.S.Code Cong. & Admin.News 1982, p. 208 (footnote omitted), and on a 'functional' view of the political process. *Id.,* at 30, n. 120, U.S.Code Cong. & Admin. News 1982, p. 208." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763–64.

The wisdom of not summarily dismissing vote dilution claims based upon partisan politics is discussed in *League of United Latin American Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 860–861 (5th Cir.1993).

... [W]e recognize that even partisan affiliation may serve as a proxy for illegitimate racial considerations. Minority voters, at least those residing in the contested counties in this case, have tended uniformly to support the Democratic Party. At the same time, a majority of white voters in most counties have consistently voted for ... candidates fielded by the Republican Party.

\*     \*     \*     \*     \*     \*

We fully agree with the Plaintiffs that the bloc voting inquiry, like the "question whether the political processes are 'equally open,' " must rest "upon a searching practical evaluation of the 'past and present reality.' " S.Rep. 417 at 30 (quoting White, 412 U.S. at 769–770, 93 S.Ct. at 2341), reprinted in 1982 U.S.Code Cong. & Admin.News at 208. Indeed, the refusal of Congress and the Supreme Court to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race may be traced directly to this "functional" view of political life. Plaintiffs are therefore entirely correct in maintaining that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation as "political defeats" not cognizable under § 2.

\*     \*     \*     \*     \*     \*

The suggestion that Republican voters are galvanized by a "white" or "anti-

minority" agenda is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests, which clearly is not the case. At the same time, white Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent. See *Whitcomb,* 403 U.S. at 153, 91 S.Ct. at 1874.

999 F.2d at 860–861

The Defendants also point to the role of the church; the NAACP, education, coalition politics, master levers/buttons, and political successes as contributing to the partisanship within the African–American community.

With all said and done, the issue here is not whether the limited success of African–Americans in electing candidates of their choice to Charleston County Council is the result of either polarized racial voting or partisan politics. The issue is whether the political processes leading to nomination or election to Charleston County Council are not equally open to participation by members of the African–American community, a class protected by the Voting Rights Act, in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See,* § 2. Resolution of that issue requires consideration of all relevant issues including but not limited to those set out in the Senate Report. Here those factors include issues ranging from racial intimidation at the polls, the effects of historical discrimination, economic and social limitations on the African–American community, the results of County Council elections and the effect of partisan politics, among others. The ultimate question of dilution is one of fact, committed to the trial judge who is to decide it based on " 'an intensely local appraisal of the design and impact of the ... multi-member district in the light of past and present reality, political and otherwise.' " *Gingles* at 78, 106 S.Ct. at 2780 (quoting *White v. Regester,* 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973)).

Consideration of the totality of circumstances is complex and not without genuine issues of material fact. Resolving the totality of circumstances issue here is particularly ill-suited for disposition on summary judgment.

### Defendants' Motion for Preliminary Injunction

The Plaintiffs' seek a preliminary injunction, pursuant to 42 U.S.C. § 1973j(d)[4] and Rule 65[5] of the Federal Rules of Civil

---

4. (d) Civil action by Attorney General for preventive relief; injunctive and other relief

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 1973, 1973a, 1973b, 1973c, 1973e, 1973h, 1973i, or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under subchapters I–A to I–C of this chapter to vote and (2) to count such votes.

5. (a) PRELIMINARY INJUNCTION.

(1) Notice. No preliminary injunction shall be issued without notice to the adverse party. (2) Consolidation of Hearing With Trial on Merits. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the ap-

Procedure "enjoining Charleston County, South Carolina, the Charleston County Council, the Charleston County Election Commission, the individual Defendants in this action, and their agents and all persons acting in concert with them from seeking to hold or administer elections for open seats on the Charleston County Council, unless and until a proper interim or final remedy is implemented under [§ 2] to cure the vote dilution caused by the existing at-large method of election for seats on that body." United States' Motion for Preliminary Injunction.

The requirements for granting preliminary relief are well settled. In *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir.1991), the Fourth Circuit Court of Appeals outlined the precise analytical framework which courts must employ in determining whether to grant preliminary relief. First, the party requesting preliminary relief must make a "clear showing" that he will suffer irreparable harm if the court denies his request. *Id.* at 812–13. Second, if the party establishes irreparable harm, "the next step then for the court to take is to balance the likelihood of irreparable harm to the Plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." *Direx Israel,* 952 F.2d at 812. Third, if the balance tips decidedly in favor of the party requesting preliminary relief, "a preliminary injunction will be

granted if the Plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." *Id.* at 813. However, "if the balance does not tip decidedly there must be a strong probability of success on the merits." *Id.* Fourth, the court must evaluate whether the public interest favors granting preliminary relief. The award of preliminary relief is entrusted to the sound discretion of the district court. *Id.* at 811. *Multi–Channel TV Cable Company v. Charlottesville Quality Cable Operating Company,* 22 F.3d 546, 551 (4th Cir.1994).

Here the Plaintiffs assert that they have made a "clear showing" that they will suffer irreparable harm if the court denies this request because Voting Rights Act violations constitute irreparable harm and indeed violations of constitutional rights constitute irreparable harm for injunctive relief purposes. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In light of the presence of the three *Gingles* pre-conditions, it is difficult to say that the Plaintiffs have not made the requisite showing of irreparable harm.

The next question is whether the likelihood of irreparable harm to the Plaintiffs from the failure to grant interim relief decisively outweighs the likelihood of harm to the Defendants from the grant of such relief. This is a balancing test, and not, as the United States' suggests by brief, a test

---

plication. Even when this consolidation is not ordered, any evidence received upon an application for a pre-luminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

\*    \*    \*    \*    \*    \*

(d) FORM AND SCOPE OF INJUNCTION OR RESTRAINING ORDER.

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be re-strained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

of which party should bear the harm. United States' Memorandum pp. 11–12.

Clearly the individual Plaintiffs will suffer no worse harm from the denial of injunctive relief than the individual Defendants will from the granting of the relief. In one case, the individual Plaintiffs may have their votes diluted; in the other case, both the individual Plaintiffs and individual Defendants will have their votes deprived. The United States' interest in preventing the use of discriminatory voting schemes will be irreparably harmed on one hand, and the interest of Charleston County and Charleston County Council in maintaining the normal election and operation of Charleston County Council and Charleston County government will be harmed on the other. The named incumbent members of Charleston County Council would be required to remain in office for an indefinite and likely extensive period of time, or the County Council would be required to function with a number of members smaller than that necessary to conduct the business of government for an equally indefinite time. Accordingly, the balance may well tip in favor of the Defendants, but at the very least it does not tip decidedly in favor of the Plaintiffs.

Third, "if the balance does not tip decidedly [in favor of the party seeking injunctive relief] there must be a strong probability of success on the merits." *Direx Israel*, 952 F.2d at 813.

The Plaintiffs here have prevailed on the three *Gingles* pre-conditions and have presented extensive evidence regarding the totality of the circumstances. The Defendants' case hangs largely by the argument that partisanship is the reason for the racial disparity in representation on Charleston County Council. To be sure that is not an insubstantial argument, but in a totality of circumstances review, there is a strong probability that it and the Defendants' other evidence may pale when compared to the Plaintiffs' abundance of evidence concerning racial disparity in Charleston County and the effects of that disparity on the at-large election scheme. Accordingly, for the purposes of this analysis, it must be said that there appears to be a strong probability of success on the merits of the Plaintiffs' argument.

Finally, the court must evaluate whether the public interest favors granting preliminary relief.

"Intervention by the federal courts in state elections has always been a serious business, not to be lightly engaged in." *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir.1988). Still a federal court possesses the power to enjoin state elections, and the Voting Rights Act of 1965 clearly authorizes the exercise of such power in appropriate cases. 42 U.S.C. § 1973j(d). Additionally, the public interest aligns with the Congressional enactment of the Voting Rights Act prohibiting the use of an election system that unlawfully dilutes black voting strength. *Johnson v. Halifax County*, 594 F.Supp. 161, 167 (E.D.N.C. 1984).

Nevertheless, the court's use of its power must be maintained in balance with the power of local government to self-govern. *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir.1988). Because the conduct of elections is so essential to a state's political self-determination, the strong public interest in having elections go forward generally weighs heavily against an injunction that would postpone an upcoming election. *See, Page v. Bartels*, 248 F.3d 175, 194–97 (3d Cir.2001); *Chisom v. Roemer*, 853 F.2d 1186, 1189–90 (5th Cir.1988).

More importantly enjoining the elections would deprive the public of every race the right to vote. "The right to vote freely for the candidate of one's choice is of the essence of a Democratic society, and any restrictions on that right strike at the

heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The right to vote is a "fundamental political right ... preservative of all rights." *Harper v. Virginia Board of Elections*, 383 U.S. 663, 667, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). In fact, even after an adjudication on the merits that a legislative apportionment plan violates the Constitution, the court has been encouraged to exercise restraint in issuing injunctions. *See, Chisom v. Roemer*, 853 F.2d 1186, 1189 (1988).

That is not to say that there are not instances when the court should issue such an injunction. For example, the injunction has issued when a challenge concerned a prerequisite to the election, *Murray v. Kaple*, 66 F.Supp.2d 745 (D.S.C.1999), when the implementation of a change in the method of electing officials was imminent, *Taylor v. Haywood County*, 544 F.Supp. 1122 (W.D.Tenn.1982), and when a referendum would disqualify certain minority candidates, *United States v. Cicero*, No. 00C 1530 (N.D.Ill. Mar. 14, 2000) (unpublished).

▆ Here the motion has been pending since April 1 and was not filed on the eve of an election. Indeed, the primary is not due to be held for over a month, June 11, 2002, and halting the election at this stage would not be as harmful as if this were the eve of the general election. Further conducting the election under the current at-large system will perpetuate any wrong which may exist.

However, allowing the election to be held would allow the County to continue to function in an orderly fashion with County Council members who have a current interest in governing. It would be consistent with the strong public interest in having elections go forward and not impeding the power of local government to self-

govern. It would essentially maintain the status quo pending a resolution of the issues herein. Most importantly it would preserve the right of the public at-large to vote. Under these circumstances, the court would be ill-advised to engage in the serious business of intervening in local elections, and it is difficult to see how the public interest would be served by enjoining the elections.

### Conclusion

Now for the reasons stated above, it is recommended:

1. The Plaintiffs' motion for partial summary judgment on the three factors identified in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), be granted;

2. The Defendants' motion for summary judgment as to the third *Gingles* precondition and the totality of circumstances be denied, and

3. The Plaintiffs' motion for a preliminary injunction enjoining the Defendants from holding future elections for Charleston County Council under the existing at-large system be denied.

April 26, 2004.